DENNIS TROUT, APPELLEE, V.
OLSON BROTHERS MANUFACTURING COMPANY,
A NEBRASKA CORPORATION, APPELLANT.

308 N.W.2d 522

Filed July 17, 1981. No. 43468.

Lathrop, Albracht & Swenson for appellant.

Abrahams, Kaslow & Cassman for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ.

McCOWN, J.

This is an action on a written agreement to pay plaintiff termination pay of $25,000 in the event his

employment was terminated by the defendant corporation without plaintiff's consent. A jury returned a verdict for the plaintiff and judgment was entered on the verdict by the District Court. The defendant has appealed.

At the times material here, the defendant, Olson Brothers Manufacturing Company, was a Nebraska corporation engaged in the general business of manufacturing pivot irrigation systems. Its principal office was in Atkinson, Nebraska, approximately 200 miles northwest of Omaha. Theodore Olson and his wife owned 50 percent of the stock, and his brother, Carroll Olson, and his wife owned the other 50 percent. From the inception of the corporation Theodore (Ted) was president and Carroll was vice president and treasurer.

In late April or early May 1979 the plaintiff, Dennis Trout, was hired by the corporation as vice president and chief operating officer. His salary was $50,000 a year, with a severance payment of 3 months' salary if his employment was terminated by the corporation without his consent. On May 24, 1979, plaintiff was elected to the board of directors of the corporation. Plaintiff's evidence was that the corporation was in serious financial difficulty at the time plaintiff was hired and that his main responsibilities were to control and secure and improve the corporation's financial position. Ted denied that the corporation was in serious financial difficulty but admitted that the corporation was having cash flow problems.

The largest creditor of the corporation was Banco Financial Corporation which had a loan agreement with the corporation, based on current accounts receivable up to a maximum of $4 million. The corporation's largest account receivable debtor was Southwest Farms, a Texas corporation which was wholly owned by Ted Olson. As of August 29, 1979, Southwest Farms owed the defendant corporation $662,000 and Ted was disputing the amount.

The evidence is uncontradicted that on August 29, 1979, the financial condition of the defendant was such that if Southwest Farms did not pay the $662,000 owing to the corporation by August 31 the loan agreement with Banco would be in default and the corporation would not have funds to meet its payroll.

Banco called plaintiff three times on August 29 in regard to the financial situation, and in the final conversation instructed plaintiff to prepare a plan for financial recovery and to come to the offices of Banco in Minneapolis, Minnesota, for further discussions the next day. On August 30, 1979, the plaintiff Trout, Lee Duhacek, comptroller of the corporation, one of the corporation's attorneys, and several other members of the corporate staff went to Minneapolis and met with Banco officials. At that meeting the parties entered into an informal financial agreement. As a part of that agreement Banco required that (1) beginning August 31 no further shipments were to be made to Southwest Farms; (2) Ted and Carroll Olson were to meet with Banco in Lincoln within 10 days; (3) a mortgage on real estate owned by the corporation was to be executed on August 31 to Banco; and (4) $500,000 was to be paid to Banco on August 31. In exchange, Banco would postpone the payment of interest then due, waive the overage on the loan, and loan additional funds to meet the August 31 payroll and certain outstanding freight bills against an already pledged IRS refund.

The corporation representatives returned from Minneapolis on the evening of August 30 and brought with them a letter from Banco addressed to Ted and Carroll Olson which stated that unless the Southwest Farms account was paid by August 31, Banco would terminate financing. Ted Olson had been in Texas on August 30 and returned to Atkinson, Nebraska, about midnight. Later that night he received a telegram from Banco containing the same information as the letter.

When plaintiff arrived at work on the morning of August 31, he was advised that the $500,000 transfer of funds to Banco would not be made on that day in accordance with orders from Ted. Later that morning, Ted, Carroll, Duhacek, and the plaintiff met at the offices of the corporation and discussed the financial situation. Ted was outraged and furious. He said he did not need Banco and was not going to meet with any bankers or deposit money from Southwest Farms into the corporation account or execute any second mortgage. He suggested that he would meet the payroll by depositing $500,000 into his personal account.

When Ted left, Carroll Olson, Duhacek, and the plaintiff decided that Ted would have to be removed as president and that they would call a special meeting of the board of directors to meet at the offices of the corporation's attorneys in Omaha, Nebraska, at 5 p.m. that afternoon.

There were five members of the board of directors, Ted Olson, Carroll Olson, Lee Duhacek, Dale Wilson, and Dennis Trout, the plaintiff. All of them were also employees of the corporation and all were at the corporation office in Atkinson, Nebraska, on August 31 except Dale Wilson. He was at the State Fair in Lincoln, Nebraska, in charge of the corporation's promotional booth. Verbal notice was given to each of the five directors. The evidence is somewhat in conflict as to the exact time at which Ted was notified, but it was sometime between 11:30 a.m. and 1:30 p.m.

At approximately noon Carroll Olson, Duhacek, and the plaintiff picked up the corporate records and took them to an accountant's office in Atkinson. They met there to avoid Ted because they were afraid of his violent reaction. At approximately 1 p.m., Ted came into the accountant's office. He was extremely angry. There was testimony that a physical scuffle between Ted and Carroll occurred at the time and Ted told Duhacek and the plaintiff that they were fired.

Carroll Olson, Duhacek, and the plaintiff flew to Omaha in a chartered plane. The directors' meeting was called to order at approximately 5:30 p.m. in the offices of the corporation's attorneys in Omaha, Nebraska. Four of the five directors were present. Ted Olson was not present. Carroll Olson was elected temporary chairman and Duhacek was elected temporary secretary. The board amended Article III, section 4, of the bylaws of the corporation by deleting provisions that the president could not be removed from office except by vote of all the directors of the corporation other than the president and substituting a provision that any or all elected officers of the corporation may be removed from office without notice and without assigning any cause by the vote of a majority of the directors present at any regular or special meeting at which a quorum is present. The board then adopted a resolution removing Ted Olson as president and chief executive officer of the corporation and elected Carroll Olson as president and chief executive officer of the corporation, effective immediately. The directors then adopted a resolution authorizing the officers of the corporation or any one of them to execute and deliver to Banco Financial Corporation a second real estate mortgage on certain described real estate owned by the corporation and also authorized and directed the officers of the corporation to list certain property for sale.

The actions of the board were all taken by affirmative vote of three to one with Wilson voting "no." Upon completion of these actions the meeting of the board of directors was adjourned.

After the directors' meeting was adjourned, Carroll Olson, as president of the corporation, made an agreement with the plaintiff to continue as vice president and chief operating officer of the corporation at an annual salary of $50,000 per year, and that in the event of the termination of his employment by the corporation without his consent, plaintiff would be paid termi-

nation pay of $25,000 within 7 days after the termination. The agreement was confirmed in writing signed by Carroll Olson as president and chief executive officer of Olson Brothers Manufacturing Company.

On September 2, 1979, an agent on behalf of Ted Olson offered plaintiff $25,000 to resign immediately. The offer was refused. On September 6 Carroll Olson entered into an agreement to sell all his stock in the corporation to Ted Olson. Under the agreement Carroll was to resign as president and vote to reelect Ted as president and plaintiff's position as both a director and an officer was to be terminated. A special meeting of stockholders and directors was held on September 7, 1979, at which that agreement was consummated and plaintiff was fired. When plaintiff was notified of his termination as an officer and director of the corporation he made oral and written demand for the $25,000 severance pay, which was refused by the corporation. This action was filed on September 26, 1979.

The case was tried to a jury in April 1980 and the jury returned a verdict for the plaintiff in the sum of $25,000. This appeal followed.

The defendant contends that as a matter of law there was insufficient notice to Ted Olson of the special directors' meeting and insufficient proof of any financial emergency and that the actions taken at the special directors' meeting in Omaha, Nebraska, on August 31, 1979, were invalid and of no force and effect and that the act of Carroll Olson in making the employment contract with the plaintiff was, therefore, an ultra vires act and not binding on the corporation.

The bylaws of the corporation which are involved here were the initial bylaws of the corporation, ratified and adopted by the stockholders, board of directors, and officers of the corporation on January 2, 1968. A portion of Article II, section 3, of the bylaws provided: "Regular meetings of the Board of Directors may be held without call or formal notice, at such

places, within or without the State of Nebraska, and at such times as the Board may determine by formal resolution. Special meetings may be held at any place, either within or without the State of Nebraska, as may be called by the president or any two members of the Board of Directors. Except as otherwise provided herein, notice of meetings of the Board of Directors shall be given either personally or by mail, and if by mail, such notice shall be sufficiently given if deposited in the United States mail not less than five (5) days prior to such meeting, addressed to the director, with postage thereon prepaid. Waiver by a director in writing of notice of any directors' meeting, whether before or after the time of such meeting, shall be equivalent to giving such notice. Attendance of a director at such meeting shall constitute a waiver of notice of such meeting."

Article II, section 4, provides in part: "A majority of the Board of Directors shall be necessary and sufficient to constitute a quorum for the transaction of business at all meetings thereof, and the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors."

Article IX provides: "The Board of Directors shall have the power, by the affirmative vote of a majority thereof, to make, alter, or repeal the By-laws of the corporation; provided, however, that a majority of the stockholders at any regular or special meeting may make, alter or repeal the By-laws, and the Board of Directors shall not thereafter alter or repeal any portion of the By-laws which have been so made, altered, or repealed by the stockholders."

In the case at bar the evidence is undisputed that each director, including Ted Olson, had actual personal notice of the special meeting of the board of directors, and four of the five directors attended the special meeting. The defendant corporation now contends that the notice did not give Ted Olson a reasonable amount

of time in which to travel to the meeting.

The problem with that contention is that the jury was specifically instructed that the notice that must be given to the members of the board of directors for a special meeting must be given a reasonable length of time before the time fixed for the meeting of the board of directors, affording each of them a reasonably ample time to attend. The issue of what was a reasonable time under the circumstances present here was specifically submitted to the jury and the jury determined that issue.

The defendant corporation also contends that there was no financial emergency sufficient to justify a special directors' meeting on such short notice. The defendant concedes that the giving of notice of a special directors' meeting may be excused because of an emergency which demands immediate attention, at least so far as an absent or inaccessible director is concerned. See Fletcher, Cyclopedia of the Law of Private Corporations § 408 (rev. perm. ed. 1969). In this case the jury was instructed that a real emergency to the corporation which demanded immediate attention could excuse the requirement of notice but a fancied emergency could not. The jury was also instructed that a financial crisis of a serious nature to the corporation, if it found such a condition existed, can be a real emergency. Just as with the issue of reasonable time of notice, the issue of whether or not an emergency existed was specifically submitted to the jury and the jury determined that issue.

Finally, the defendant corporation argues that because the initial bylaws were ratified and adopted by the board of directors and by the stockholders, none of the bylaws could thereafter be altered, amended, or repealed by the board of directors, even though Article IX specifically gives the board of directors the power to do so. The defendant cites no authority for the proposition nor have we found any.

The bylaws themselves provide: "The Board of Di-

rectors shall have the power, by the affirmative vote of a majority thereof, to make, alter, or repeal the By-laws of the corporation . . . ." That power is limited only by the proviso that if the stockholders at a regular or special meeting make, alter, or repeal any portion of the bylaws, the board of directors shall not thereafter alter or repeal that portion. If those provisions be interpreted to mean that the ratification of the initial bylaws of the corporation by the stockholders is an exercise of the proviso, then the board of directors has no power whatever to make, alter, or repeal the bylaws. Under the circumstances here, the proviso did not come into operation and the board of directors had the power to make, alter, or repeal the bylaws of the corporation.

The case before us is a law action tried to a jury. The verdict of the jury turned upon a determination of the factual issues based on conflicting evidence. The instructions covered the issues and fairly submitted the case to the jury. In a law action it is not within the province of the Supreme Court to weigh or resolve conflicts in the evidence. The credibility of witnesses and the weight to be given their testimony are for the trier of fact. A verdict by a jury based upon conflicting evidence will not be set aside on appeal unless it is clearly wrong. *Merten v. Pedersen,* 199 Neb. 34, 255 N.W.2d 869 (1977).

The verdict of the jury was not clearly wrong and the judgment of the District Court was correct and is affirmed.

AFFIRMED.